IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DARREL D. BURTON,            ) | |
| ) | |
| Plaintiff,            ) | |
| ) | |
| v.            ) | No. 19-CV-03875 |
| ) | |
| WILL COUNTY SHERIFF'S MERIT            ) | Judge John J. Tharp, Jr. |
| COMMISSION, WILL COUNTY            ) | |
| SHERIFF'S OFFICE, and WILL            ) | |
| COUNTY,            ) | |
| ) | |
| Defendants.            ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Darrel Burton applied for a deputy sheriff position with the Will County Sheriff's Office in 2010. The Will County Sheriff's Merit Commission ultimately declined to place Burton on its certified list of applicants from which the final candidates could be selected. Burton filed the instant lawsuit against the County, Sheriff's Office, and Sheriff's Merit Commission, claiming that their refusal to hire him was racially discriminatory in violation of Title VII. The defendants moved for summary judgment on Burton's claim. For the reasons set forth below, the defendants' motion is granted.

**BACKGROUND**[1]

The Illinois Counties Code provides for the establishment of certain appointed bodies at the county level called "merit commissions." 55 ILCS 5/3-8002. Among other duties, a county's merit commission is tasked with carrying out "certification for employment and promotion" for

---

[1] The facts recounted in this section are undisputed unless stated otherwise. The defendants' statement of material facts (ECF No. 52) will be cited as "DSMF"; the plaintiff's (ECF No. 54) as "PSMF."

the county's sheriff department. 55 ILCS 5/3-8007. The commissions are also charged with formulating and adopting "rules, regulations and procedures for [their own] operation and the transaction of [their] business." 55 ILCS 5/3-8009.

Will County has adopted this system by ordinance. *See* Will County, Illinois, Code of Ord. § 33.003(A). Will County's Merit Commission consists of five members, each appointed by the Sheriff and approved by the County Board. *Id*. Other than the appointed members, the only other employees of the Merit Commission during the relevant period were Pam Taylor, who was in charge of coordinating the certification process for the deputy sheriff position, Kathy Rogina, who reported directly to Taylor and assisted with the certification process, and some part-time investigators who conducted background checks for new hires. The Merit Commission had fewer than fifteen employees at all relevant times. DSMF ¶¶ 8-15.

The Merit Commission's process for certifying deputy sheriff applicants is thorough. It entails a short-form application, written exam, physical agility exam, long-form application, review of credit, review of social media, collection of documents, fingerprinting, photograph, psychological evaluation, polygraph examination, "mail-out" consisting of inquiries sent to the applicants' listed professional and personal references, background investigation, and oral interview with the Merit Commission. DSMF ¶¶ 17-18. During the background investigation stage, the Merit Commission assigns the applicant's file to an investigator once it receives enough completed reference forms. DSMF ¶ 19. The investigator then conducts in-person interviews with the applicant's neighbors, does a credit check, reviews the mail-out responses, contacts former employers if it has not received mail-out responses from them, and then provides a written summary to Taylor or Rogina at the Merit Commission. DSMF ¶¶ 20-22. Taylor or Rogina then

2

type out the investigator's handwritten summary in a background investigation summary memorandum for the Merit Commission's appointed members' review. DSMF ¶ 23.

If, at any point during the certification process, a red flag is raised about an applicant, Taylor presents the issue to the appointed members of the Merit Commission.[2] DSMF ¶ 24. The Merit Commission then considers that information and decides whether to remove the applicant from the certification process before the oral interview stage, as long as a quorum is present. Otherwise, in the absence of any red flags, the applicant would sit for the oral interview, and the Merit Commission would vote on whether the applicant can be certified. DSMF ¶¶ 24-30; PSMF ¶ 9. Eventually, a list of certified applicants is compiled, certified applicants remain on that list for two years, and the Sheriff's Office selects from that list a number of applicants to interview and eventually hire as deputy sheriffs. DSMF ¶¶ 34-35.

Burton, who is Black, applied for a deputy sheriff position with the Will County Sheriff's Office in 2010. But to be eligible for an interview with the Sheriff's office, he, like all other applicants, needed to first be certified by the Merit Commission. It was smooth sailing at first. Burton passed all of the required examinations and his application did not raise any red flags. PSMF ¶ 4; DSMF ¶¶ 39-49. The Merit Commission then assigned Burton's file to Richard Ackerson, a sergeant in the Sheriff's Office's Internal Affairs Division, for the background investigation. DSMF ¶¶ 50-51. Ackerson's duties as sergeant included assisting the Merit

---

[2] As to what might be a red flag, Taylor gave the following examples: "If we had a polygraph that they don't pass or if they have excessive alcohol or drug use, that's something that would be a red flag. If their fingerprints came back and they had arrests that were not listed would be a red flag; a bad personal or employment reference, bad being if there was a red flag in it, more so if they don't recommend them for hire or if they have shared information as was in this case, this was something that the board would review prior to oral interview." Taylor Dep. Tr. 77:8-17 (ECF No. 65-1).

Commission with background investigations for hiring, and in this capacity, he reported directly to the Merit Commission.

Burton's numerous personal references all spoke very highly of him and recommended him for the position. PSMF ¶ 19. But Burton's employer at the time, Canadian National, had not responded to the Employment Inquiry form. DSMF ¶ 54. Part of the background investigator's role is to contact references who do not respond to the mail-outs. So, Ackerson called Canadian National and spoke with Burton's then-supervisor, Mike Youngman. DSMF ¶ 55. Youngman told Ackerson the following:

- He would rate Burton's "ability to work with others" and "dependability" as "poor." DSMF ¶ 57.

- Burton was "currently off on a questionable work[-]related injury[.] He reported the accident 18 days late and it is currently under investigation." DSMF ¶ 58.

- "Mr. Burton has not been a dependable employee, and they would not rehire him, nor do they recommend him to the" Sheriff's Office. DSMF ¶ 59.

Burton does not dispute that Youngman told Ackerson these things but only that it was unreasonable for Ackerson to take them at face value without any additional inquiry. *See* Pl.'s Resp. to DSMF ¶¶ 58-59. It is true that Ackerson did not probe Youngman much further.

Based on that conversation, Ackerson included the following in his summary memorandum to the Merit Commission regarding the background investigation:

> Work History:
>
> Employment history is as follows: Mr. Burton has been employed with the Canadian National Railroad as an Assistant Signalman since December 2010. They responded with good to poor ratings on our questionnaires. He received "Good" ratings in Attendance and Willingness to accept Supervision, and "Average" ratings in Ability to Learn and Quality of Work, and "Poor" ratings in Ability to work

4

> with others, and Dependability. One reported injury to his shoulder and knee.
>
> * Per our phone conversation with Mr. Youngman, his immediate supervisor, he stated that Mr. Darell [sic] Burton is currently off on questionable work related injury that he reported 18 days late. He would not rehire him and would not recommend him for hire on [sic] our department.

DSMF ¶ 61.

Since Pam Taylor from the Merit Commission considered Burton's employment reference from Canadian National to be a red flag, she presented the information to the appointed members of the Merit Commission and read verbatim what the reference had said. DSMF ¶¶ 63. The Merit Commission then removed Burton from the certification process without moving on to the interview stage. DSMF ¶ 64. Burton admitted he had no reason to believe that anyone from the Sheriff's Office or Will County played any role in the decision to remove him from the certification process. DSMF ¶ 67.

Burton contends that his race was reflected in his application materials via photographs and a disclosure during the fingerprinting process. PSMF ¶ 1 (disputed in part). The parties dispute the extent to which members of the Merit Commission were made aware of Burton's race because they dispute which documents were submitted to the Merit Commission during their review of Burton's application. Burton admits that no one made any comments about his or anyone else's race during the certification process, nor did any of the defendants' representatives make any comments that would have led him to believe that race factored into the decision not to hire him. DSMF ¶¶ 69-70.

The reasons for the Merit Commission's rejection of any applicant are, by ordinance, not subject to disclosure. DSMF ¶ 66. Burton testified that he filed this lawsuit because he "wanted to know why [he] was taken out of the [certification] process." DSMF ¶ 73. He suspected that race

5

might have played a role in the Merit Commission's decision because he saw other non-Black people who had taken tests with him eventually driving around in Will County Sheriff's Office vehicles. DSMF ¶ 71.

## **ANALYSIS**

Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). If the moving party has demonstrated the absence of a disputed material fact, then the burden shifts to the nonmoving party to "provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

Title VII prohibits unlawful employment practices, including "to fail or refuse to hire . . . any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). The defendants have moved for summary judgment on two independent bases. First, they contend that the Merit Commission, as the employer that made the adverse hiring decision against Burton, is exempted from Title VII's coverage because it has fewer than fifteen employees. *See* 42 U.S.C. § 2000e(b). Second, the defendants argue that even if Burton can bypass the "tiny employer" exemption, he has failed to adduce sufficient evidence that the decision not to certify him was based on his race. The defendants' latter argument is correct. The Court grants summary judgment in their favor on that basis and declines to reach the first issue.[3]

---

[3] The Seventh Circuit has delineated multiple "situations in which the policy behind the exemption of the tiny employer is vitiated by the presence of an affiliated corporation." *Papa v. Katy Industries, Inc.*, 166 F3d 937, 940 (7th Cir. 1999). But neither party has directed the Court to, nor has the Court found, any in-circuit precedent on when it is appropriate to aggregate multiple

To survive summary judgment on his Title VII racial discrimination claim, Burton must have adduced sufficient evidence that, "considered as a whole," "would permit a reasonable factfinder to conclude that [his] race . . . caused the . . . adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The defendants contend that Burton has failed to do so. According to them, the evidence, even when viewed in the light most favorable to Burton, shows that he was not qualified for the position due to the poor employment reference from Canadian National, and Burton has not pointed to evidence that can sufficiently undermine the legitimacy of that reason for not hiring him. The defendants further argue that not only has Burton failed to offer any evidence capable of proving that the poor employment history was simply a pretext for an illicit race-based reason for not certifying him, but Burton generally lacks any evidence of racial animus on the part of any decisionmakers or those responsible for contributing information on which the decisionmakers relied, like Ackerson.

The Court agrees. There is no genuine dispute that the Merit Commission removed Burton from the certification process because of the poor reference from his then-current employer. Burton has not adduced sufficient evidence for a reasonable juror to be able to conclude otherwise. First, the negative reference from Youngman was a legitimate justification for the Merit Commission's decision. It has long been held that "an employer may render employment decision [sic] on the basis of references received from the prior employers of job applicants. The lawfulness of reference-checking under Title VII has been considered and confirmed in several cases." *Reeves v. S. Bell Tel. and Tel. Co.*, 76-2428, 1978 WL 13942 at *4-5 (D.S.C. June 19, 1978) (collecting

---

governmental entities as a single employer for Title VII purposes or for an analogous antidiscrimination statute, though other courts have grappled with the issue and acknowledged that the standard may differ from that for private employers. *See, e.g.*, *Satterwhite v. Ashtabula County Metroparks*, 514 F. Supp. 3d 1014, 1025 (N.D. Ohio 2021).

cases across various jurisdictions). In other words, "Title VII does not compel employers to hire unqualified applicants with questionable employment histories." *Lee v. National Can Corp.*, 699 F.2d 932, 937 (7th Cir. 1983). Here, Burton does not dispute that (1) the sole professional reference uncovered during the background investigation was a negative one from his then-current employer, (2) poor employment references gathered during the background investigation typically raise a red flag meriting the Merit Commission's consideration prior to an oral interview, (3) details of the negative reference were provided to the Merit Commission because they constituted a red flag in Burton's application, (4) the Merit Commission voted to remove Burton from the certification process, thus making him ineligible for the position of deputy sheriff, after reviewing the details of the negative employment reference, and (5) the Merit Commission made the decision not to certify Burton on its own accord, without input from the Sheriff's Office or Will County.

These key admissions are fatal to Burton's claim, especially in light of his failure to offer any serious evidence of pretext.[4] The Seventh Circuit recently summarized the mechanics of pretext in Title VII cases as follows:

> If the employer supplies a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to produce evidence that the defendant's reason is pretext for discrimination. In this context, pretext means a lie, specifically a phony reason for some action. We have also referred to pretext as an employer's efforts to cover their tracks or hide their real reason for not hiring an applicant. Yet, a

---

[4] The issue of the negative reference goes to both Burton's burden of showing that he was "qualified" for the position and whether the Merit Commission relied on a legitimate, non-discriminatory reason in deciding not to hire him as opposed to an illicit one under the *McDonnell-Douglas* framework. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). But "[i]t is not always necessary to march through this entire [*McDonnell*] process if a single issue proves to be dispositive. Here, as is often true, that issue is pretext or the lack thereof." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002); *see also Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) ("The prima facie case and pretext analyses often overlap, so we have said that we can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action.").

8

> showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus.

*Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 746-47 (7th Cir. 2021) (cleaned up). Burton's arguments for pretext and animus fall short even when viewing the evidence holistically and in the light most favorable to him.

### *The Merit Commission's Knowledge of Burton's Race*

The parties dispute whether the Merit Commission's appointed members were made aware of Burton's race via documentation provided to them prior to their vote to remove him from the process. While "an employer's lack of knowledge about a protected category [usually] rings a death knell for discrimination claims," *Holmes v. Potter*, 384 F.3d 356, 362 (7th Cir. 2004), *i.e.*, knowledge of the plaintiff's protected trait is generally a necessary condition, the fact of knowledge itself hardly moves the needle without other evidence. Because, as detailed below, scant evidence of pretext and racial animus exists, it can be assumed for the purposes of this order that the Merit Commission's members were provided with documents that indicated Burton's race.

### *Timing of the Proffered Justification*

Burton first attempts to undercut the Merit Commission's proffered reason—that Burton was unqualified due to his work history—by challenging the plausibility of its reliance on the negative reference from Canadian National. To that end, he argues that it is suspicious that "Defendants did not mention the reference form from Canadian National until nearly eight years after Burton was removed from the process." Pl.'s Resp. (ECF No. 55) at 14. The defendants rightly point out that this is because (1) Merit Commission rules prohibit disclosure of the reasons for rejecting an applicant and (2) this litigation (and thus document discovery) did not commence until eight years later due to the timing of the EEOC investigation and the plaintiff's filing of the action. Accordingly, this argument for pretext goes nowhere.

9

*Contemporaneous Documentation*

Burton also claims that it is suspicious that the phrase "Out per bad b/g" is written on an application chart in front of certain applicants who supposedly received unfavorable background check results' names, but not Burton's. Presumably, according to Burton, had his application actually been dinged because of the background investigation, and not some other factor (such as his race), then the applicant chart would have had that written next to his name too. But Burton has not offered any testimony or other evidence supporting this interpretation of what it means to have "Out per bad b/g" written by one's name on the chart, while the defendants have convincingly explained that it means that a red flag in the applicant's was found during the long application—not background investigation—phase of the process. *See* Defs.' Resp. to PSMF ¶ 26.[5] Recall that Burton's red flag came up after he had made it through the long application stage.

*Superficiality of Ackerson's Background Investigation*

Burton next contends that "Ackerson's manner of conducting the investigation further supports the notion that the background investigation could not have been a valid basis for removing Burton from the process." Pl.'s Resp. at 14. That is, as opposed to focusing on whether the Merit Commission actually based its decision on the negative reference, Burton broadens his scope to argue that it is suspicious that Ackerson's probe into the Canadian National reference was unreasonably superficial. Ackerson should have, according to Burton, been more suspicious of

---

[5] The defendants state: "[T]he phrase 'Out per board bad b/g' appears under the names of certain applicants in the column titled 'Long Ap,' and for those applicants the remainder of the columns to the right of the column titled 'Long Ap' are empty. . . . In contrast, the notation in the column titled 'Long Ap' in front of Burton's name is simply 'x,' and the columns to the right of the column titled 'Long Ap' are all filled in with various information until the column titled 'status,' which notes 'out per board.' . . . All of the other applicants who have a notation of 'out per board' in the 'status' column have an 'x' in the column titled 'Long Ap,' just like Burton." Defs.' Resp. to PSMF ¶ 26.

10

Youngman's responses because they contradicted other information received about Burton during the background interviews with Burton's personal references.

Ackerson was not a decisionmaker. Any discriminatory wrongdoing by him can only be attributed to the Merit Commission through the "cat's paw" theory of liability, under which "an employer can be held liable where a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action. To prevail under such a theory, [Burton] would have to demonstrate that [Ackerson] was motivated by discriminatory animus and falsely reported," *Simpson v. Beaver Dam Community Hosps., Inc.*, 780 F.3d 784, 797-98 (7th Cir. 2015) (cleaned up), information to the Merit Commission.

But here, like in *Simpson*, the plaintiff "points to no evidence that [the non-decision-making employee] was motivated by discriminatory animus because of his race, 'and [the Court is] not required to draw inferences that, are supported by only speculation [or] conjecture.'" *Id.* at 798 (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 915 (7th Cir. 2013)). It is not the function of the Court or a jury to "'sit as a superpersonnel department' where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quoting *Holmes v. Potter*, 384 F.3d 356, 361 (7th Cir. 2004)). Similarly, it is not the function of the Court or a jury to determine the appropriate level of scrutiny an employer or its investigator should use in collecting information about an applicant during its background investigation, or to infer discriminatory animus ***simply because*** the investigator's inquiry was not as rigorous as the plaintiff would have liked. Evidence of bad faith or animus in the manner of conducting the investigation is required. *See, e.g.*, *Young v. Farmland Foods, Inc.*, No. 76-0-495, 1979 WL 15420 (D. Neb. June 7, 1979). It's absent here. Burton has not come close to showing, for example, that Ackerson had any

11

articulable reason to think Youngman's responses were untruthful or biased, that he usually probed harder when non-Black applicants received negative references, or he gave more weight to the negative reference in his summary of Burton's background than he did with non-Black applicants where the references were comparably negative.

*Statistical Evidence of Disparate Treatment*

Burton purports to offer statistical evidence that the Merit Commission treated white and non-white applicants for certification disparately. He offers no expert testimony, only documents and information obtained through discovery:

> Defendants did not produce a complete list of the candidates in the 2011-2012 deputy sheriff application cycle that disclosed their races during discovery. Of the applicants whose races were known, 7 out of 119 (5.8%) were non-white. Of those applicants, six of them passed every test and step in the process prior to their information being presented to the Commission. However, only two of these individuals were placed on the certified list. The two individuals (Desmond Warren and Denise Malone) represented just 2.5% of the entire list of 78 individuals on the final certified list. What this evidence shows is that although 85% of minority applicants successfully completed every test and evaluation and their information was submitted to the Commission, only 33% of those candidates made it through the Commission's filter and were placed on the certified list. This figure stands in stark contrast to the success rate of 76.4% for applicants overall to get through the Commission.

Pl.'s Resp. at 11 (internal citations omitted).

This evidence is intended to help make his prima facie showing of discrimination and show that the proffered reason for not certifying him was pretextual. The Seventh Circuit has held that in "an individual rather than a class action, . . . evidence of a pattern or practice can only be collateral to evidence of specific discrimination against the plaintiff herself." *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014). As outlined above, Burton's evidence of specific discrimination is severely lacking. Even if Burton's statistical evidence tended to show the Merit Commission generally treated non-white applicants worse than white applicants, he still

12

has not shown that the Merit Commission did not "honestly believe[] the nondiscriminatory reason," *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010), behind its refusal to certify him, *i.e.*, that Burton was not qualified for the job due to the negative employment reference. Perhaps it would be possible with overwhelmingly strong statistics using more rigor (a larger sample size, for starters), or perhaps more targeted statistical evidence (*e.g.*, a greater percentage of white applicants with negative marks on their employment histories end up certified than non-white applicants with such marks).

Burton's statistical argument lacks commonsense appeal, much less statistical rigor. He has made no effort to show what variables may have been at play during the other five[6] non-white applicants' certification processes in comparison to the broader pool of applicants. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000), *overruled by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) ("'Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference' of discrimination. A plaintiff must show 'disparate treatment between comparable individuals.'" (quoting *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 (10th Cir. 1996)). Apart from Burton, two of the other five non-white applicants (both Black) were ultimately certified, one, whose race was listed as "Other," *i.e.*, neither Black, Asian, nor Caucasian, was, like Burton, denied an interview based on negative information that surfaced during the pre-certification investigation, and two (both Asian) were rejected after participating in the oral interview with the Merit Commission.

Simply put, a reasonable juror could not look at these figures and conclude that the Merit Commission made its decision not to certify Burton because he was Black and not because his

---

[6] Specifically, the five non-white applicants who passed their initial examinations. One other non-white applicant, for example, failed the polygraph test.

then-supervisor—the only professional reference that was gathered—rated him "Poor" on his ability to work with others and dependability, declined to recommend him for the job, and stated that he would not rehire him, in addition to sharing the issue about a possibly fraudulent injury.

*   *   *

For the foregoing reasons, summary judgment is granted in favor of defendants Will County, Will County Sheriff's Office, and Will County Sheriff's Merit Commission.

Dated: March 30, 2023

John J. Tharp, Jr.
United States District Judge